noon is 410-0299 Kelly versus Pennock for the propellant is Richard Jones. Very easy. The employee is Raymond Fabricius. How's that pronounced, sir? Fabricius. Fabricius. Thank you. OK, Mr. Jones, you may proceed. Please report, counsel. Counsel. Again, my name is Richard Jones. I represent Greg and Eva Kelly, the appellants in this matter. By way of background, this was a personal injury case filed in Pike County. The case was tried before a jury, and pretty much the sole issue before the panel is the claim that a juror was allowed to sit on the jury after he answered the jury card with incorrect information regarding whether or not he's been involved in a prior lawsuit or not, or a witness in a civil suit or not. By way of background, when the jury selection began with the entire panel, the trial court asked the entire veneer if the answers on the juror cards were correct based upon what they had filled out a couple of weeks before. All the jurors said the information was correct. The trial court then proceeded to question the jurors about various matters, and the ones that answered yes to ever a party or witness in a civil suit, the trial court asked them about those matters. During this entire time, when the court asked the jurors as a whole, and when he was asking the individual jurors about ever been a party or witness in a civil suit, a Mr. Steers, who was the juror that I maintained was improperly allowed to sit on the jury, remained silent. There were other jurors that did raise their hand or bring it to the court's attention about prior civil suits, and one of them was a Mr. Capps, who at a sidebar indicated that not he was a party, but his company was a party to a lawsuit. And just by happenstance, that lawsuit was brought by my co-counsel and referring attorney. Nonetheless, Mr. Steers, at no time during the trial did he bring up that he had been a party or witness to a civil suit. The case went for three days, the jury came back and found for the defendant. After that, it was discovered that Mr. Robert Steers had been less than candid in his comments on his juror card. When he answered no, he should have obviously answered yes. What we now know about Mr. Steers is that, and this happened in Pike County, I think we could all agree it's a small rural county. What Mr. Steers had been through and what we now know about him is that he's a highly educated man, he's got a college degree, a master's degree, he's a small business owner, he owns a 750 acre farm that he owns and operates. So he's a highly educated man. We also know that as part of running his farm, one of his farm implements was driven by one of his agents or employees, which of course he denied, was involved in an accident that killed two young adults in Pike County. As a result of that collision where these two people died, Mr. Steers we now know had two wrongful death cases filed against him, his insurance company sought to deny him coverage on his insurance policy, he participated in answering interrogatories, answering complaints, he sat for a discovery deposition, and the cases went on for four to five years. They were resolved a few years before this incident case went to trial. At no time during the trial or at any time did Mr. Steers bring to the court's attention that he had in fact been involved in these wrongful death lawsuits. After the fact, and of course he claimed that nothing triggered his memory about being involved in these lawsuits or anything like that. At the post-trial proceedings, Mr. Steers was subpoenaed to come in and testify and we got additional information about some of the things that went on with these lawsuits where the two people were killed. One of them was that State Farm, I believe it was his insurance company, sought to deny him coverage, he had to hire his own lawyer to protect his personal assets, he had to lawyer $20,000 out of his pocket. At the post-trial hearing before the trial court, Mr. Steers claimed a complete 100% memory loss of each and every event regarding these multiple deaths that he was charged with or alleged to have contributed to, paying the $20,000 out of pocket, etc., etc. He claimed he had no recollection of that until he was contacted after the trial in this case. He also testified at the post-trial proceedings that when he was contacted after the trial in this case and was subpoenaed to come in, that he had called his lawyer again that he had used to protect his personal assets and that he realized that he was in trouble. At the post-trial proceedings, he basically denied everything, denied knowledge until it was brought to his attention. What if that were true? What if it was true that we had known that? No, no. What if it's true that what he said at the hearing, that he didn't remember anything about it, didn't associate his earlier lawsuits with the court's questions and had forgotten all about it when he responded and when he served? I find that hard to believe. But that wasn't my question, Counselor. What if it's true? Yes. That he had a complete memory loss of that entire event and all the things that he went through? Yes. If it's true, I suppose that he could say that he was fair and impartial, but I just Here's the problem, Mr. Jones, and I can understand your argument and your feeling the way you do, but you're looking at a panel that cumulatively has about 35 years' experience as trial judges. Yes. We've all been there. We've seen and heard witnesses who testify. We've made calls regarding credibility. As a panel on the appellate court, we understand how much better is the trial judge's view of the witnesses they see than ours, which is essentially nonexistent. We have the cold record. The judge, in this case, Judge Greenlee, says, I heard and saw this guy. I believe him. Your position is essentially that's a mistake, that we should second-guess the trial judge. So my question is, how are we supposed to do that? I guess how you can do that is that I cannot fathom a more extreme set of circumstances or facts where somebody claims they forgot about something, where they were charged with contributing or causing the death of two people. I just can't fathom anybody forgetting that. I know the trial judge made that finding at the post-trial motion. Maybe Steers is just a... Well, what's it... In another way, look, what's all this to Steers? Why would he care? I mean, when he filled out the card, first of all, he had no indication that... Oh, true. ...he was going to be serving on this particular case or any other case. So, I mean, you know, when you talk about ulterior motive, he didn't have any, does he? When he filled out the card, he had no ulterior motive. Okay. He did not know anything about the case. Or even what case. It would be civil or criminal or a petty case. Correct. They say, we have no cases. You can go home. Right. But once he got there and the judge starts asking about, have you been involved in a civil suit and all the other matters, you would think something would have triggered his memory however slight by thinking, well, you know, judge, maybe I should ask you about this. You know, I'll raise my hand. Does this qualify as that? But for him to sit there and just, you know, we're not talking about somebody that's undereducated that doesn't know what's going on. What was the relationship with Steve Rapp to those other suits that the juror was in as well as to this... Was he present in the courtroom? No. Okay. Well, his name first came up when the prospective juror said his company was involved in a lawsuit. So I told the judge, you know, because I'm not from Pike County, I said, judge, you know, Mr. Rapp's name may come up because his wife is the reader in the evidence step. The judge then announced that before the jurors were even selected. They were all just sitting there, all 36 or 48. His name came up then. And then Rapp's name, or Rapp was involved in one of the wrongful death cases where he made the claim against Mr. Steers, filed the complaint against Mr. Steers, the wrongful death complaint against Mr. Steers, participated in the entire thing until the case was resolved. Was there a trial where Mr. Rapp would have been present while the juror was in the courtroom? In this case? No, in the case that the juror was involved in. In the wrongful death cases, I believe Mr. Steers was successful in defeating the declaratory judgment and the insurance company finally paid the policy limits to the two estates. So there was not a trial in the wrongful death cases. So would this juror have been deposed by Mr. Rapp? He was deposed by, there were two lawyers, Mr. Rapp and Mr. Depke, representing the estate. I believe Mr. Depke did the deposition. But I think whether Rapp's involved or not, I don't think that's true. Is he a recurring attorney in this case? Yes. Was he local counsel for you? Yes. So why didn't you have him present at jury selection since you're not from Pike County? And apparently he is. Well, he's from Adams County, but close enough. But it was only a three-day trial. I think we had four witnesses. I mean, it wasn't a long case where you need somebody to assist you for a week. What I'm talking about is the local aspect of it, looking over the names of the jurors. Is there anybody on here that rings a bell for you? Well, could he have been there? Yes. But I don't think there's any obligation or duty for him to be there. But you went to him after the trial to show him the list of jurors who served on the case, and that's where he picked up on Steers' name. Right. We picked the jury on a Monday morning, and this was Wednesday, early Wednesday afternoon, maybe supper time, something like that. But, I mean, it wasn't really practical. You know, I'm a one-man show. For me to be driving back and forth and doing whatever with time constraints of a trial and witness preparation and all those things. How long in advance did you get the list of jurors? We got them right before we picked the jury. That morning? That morning. Monday morning, the court came out, the judge came out, he said, here it is, and he had a little chart and he explained how he did it. Did you ask for the juror questionnaires ahead of time? Excuse me? Did you ask for the circuit clerk to give you the jury questionnaires ahead of time? No. I don't know. Well, I did not ask. I don't even know if they would give them to me. I've never got them in advance in other cases that I've tried. I mean, sometimes they might give them to you in the morning and say, we'll pick at 1 o'clock or something, but they don't. Are we talking about Pike County specifically? No, I'm talking up in the Cook County area, Cook, DuPage. Pike County, I don't know. I mean, this case was specially set since the counselor and I were both from out of town and Judge Greenleaf is from Calhoun County. So we had kind of three people coming in and we wanted to make sure we had a good date. So, you know, they kind of impaneled a or sent out the cards to a group that was just for this case. And it was, I think, the cards were dated November 2nd, and I think we went to trial on the 17th, which was a Monday, or 16th, whatever day that Monday was, a couple weeks later. But no, I didn't ask them ahead of time. I don't even know when the clerk would get them. But anyway, I guess my position is, as I think you've acknowledged, is that I just can't believe somebody could forget this. Well, it seems to me unlikely, and I would share your skepticism, but the trial judge said, I believe him. Right, well, and then if you look at some of the cases that I've cited, I mean, you know, to show probable bias, I mean, if, you know, the unsuccessful litigant had no other suppressed information, was it, you know, good enough for challenge for cause or to exercise a preemptory challenge? I mean, I don't think there can be any doubt that, I mean, if this guy said anything about these things, I would have asked the judge, as I did with Mr. Capps, and the judge denied my challenge for cause, and then I used the preemptory. But Mr. Steers, I mean, he was basically right at the start, so it wasn't like I was out of challenges or, you know, I didn't have any left. I mean, he was, I think, in the first four or the first eight jurors. So, and plus, you know, I mean, I maintain that even if he had said it halfway through the trial, you know, judge, I was driving home last night, and I got this flashback. I got, you know, something spurred my memory. He could have said it then at any time. I'm sure the judge would have conducted a hearing, and, you know, we had 12 jurors on the panel. We had a, you know, we stipulated that 10 or more. He could have let him go. If you think he remembered it during trial, didn't say anything, what's your theory as to why not? Probably thought he was in hot water. Thought he was in trouble, like he said, at the post-trial motion, at the post-trial hearing.  Thought he said, you know, I'm here because I think I'm in trouble. Well, because somebody contacted him to say you've got to come to a hearing. He had to hire a lawyer, didn't he? He didn't have to, but he did, yes. The same one he had used in the prior one. What would the trouble, what trouble would he be in if he remembered during trial? If he disclosed it, I don't think he'd be in any trouble. So why didn't he disclose it if he remembered? Why would he? Why did he not disclose it if he remembered? Well, I can't speak for him. I mean, what have you been in trouble, what have you not been in trouble, I don't know. I mean, the cases that are cited in here, it doesn't seem like any of the trial courts really imposed sanctions against jurors, although a couple of them hint that they expressed their, you know, non-belief of the person. They didn't like what they did. But I mean, you know, I mean, the trial court can impose sanctions if they wanted to. I mean, fees, whatever. I mean, there's many things the trial court could do. I mean, maybe he just thought, you know, well, what's the big deal? I don't know. But he certainly didn't do it, and I just can't see how somebody could forget that. How many years prior to the trial here was the jurors involved in those other cases? I believe the accident was in the year of 1999, and I think the lawsuits wound up in 04, 05. And this went to trial in November of 09. But his involvement in the lawsuit was done in those other lawsuits was done before that, wasn't it? Oh, yes. The wrongful death lawsuits were done. I mean, his only involvement was primarily as the insurance company going to defend me or not, and ultimately they had to defend him, and that was all he had to do was. It's not as if he went to court and testified in that case, is it? Well, he had to answer. I'm sure he did something to assist in answering the complaints. He had to respond to the declaratory when they were trying to go after his farm. Did the case go to trial? No, sir. So it was settled? It was settled for the policy limits. But, I mean, I would think if somebody had a 750-acre farm that they own and operate, and all of a sudden your insurance company says your farm's on the line, I think that's pretty hard to forget. Just as well as two people being killed by one of your farm implements. I know what the guy said, but I just can't believe what this fellow says. Maybe he's a good liar. I don't know. I mean, he didn't look like, you know, when he sat there on the jury and he came in in front of the post-trial hearing. I mean, he's a well-enough spoken guy. Why did Judge Greenleaf believe him? I can't say why Judge, you know, he said what he said on the record. I mean, that's all I have to go on. Us too. Excuse me? Us too. That's all we have to go on. What the record says and, well, what Judge Greenleaf said. Well, I just can't fathom a more egregious set of facts or circumstances that somebody claims that they forgot. I just... Well, that explains my first question, Mr. Jones. What if it's true? Then you really don't have any case. I guess if you take what Judge Greenleaf said and what you just said, you know, you're right. But I can't believe to my dying day that this guy forgot. It just... Well, the idea about his being a liar, though, is... It does seem unlikely that he'd forget, but most liars have motive to lie. It's not... My experience, I don't know about my colleagues, is most people aren't elbowing their way to serve on jurors, juries, and if a prospective juror has got a way to get off, even in rural counties, he'd say, Oh, yeah, hey, you know, I got this big case. Better wash me out of this. I have this case in my background. As big a thrill as it is to hear about the snake bite case, I think maybe I shouldn't do that, Judge. What's his motive for lying? His motive for lying... As I said a little bit ago, I believe that he probably got too far into it and thought he was going to get in trouble, and at that point just thought nobody will pick up on it, nobody will care, nobody will find out. The case is over. You know, I'm on the jury, and then the case is done. I mean, I can't explain if he had a motive or not. I mean, the one lawyer, Mr. Depke, who was the lawyer that did most of the work on the wrongful death case, said that Steers wasn't real happy, and he thought the lawsuits against him were unfounded, and he didn't like lawsuits. Maybe that's his motive. He's stuck there on this jury, and he doesn't like lawsuits, and he's going to do what he's going to do. Thank you. Well, your time's up, counsel. You'll have a chance to address this again in rebuttal. Mr. Fabricius, is that right? I have to tell you, when I was a kid, I was always teased that you'd say, malicious. Malicious? Fabricius? And as an attorney, you'd think malicious. I have to try and avoid imposing my opinions and my beliefs in this case, because I'm the individual who called Mr. Steers when I saw the post-trial motion, and I definitely have an opinion as to what Judge Greenlee found when he found I believed the guy. Mr. Steers, when I called him, was driving down the highway, and he testified to the hearing on the post-trial motion, and I told him that, and I believe he testified to this, because initially he testified that I said he was in trouble, and I believe he agreed when I asked him at the hearing on the post-trial motion that I didn't say he was in trouble, I said, we have a problem. And he said, what's the problem? And I said, well, apparently you were involved in some prior litigation. And when I told him about the prior litigation, he was surprised, and that's what he testified to. He goes, oh yeah, I completely forgot about it. It was only over the telephone that I heard the meter. And I believe he was genuinely surprised when I told him that. And I also believe Judge Greenlee was in the best spot, and I agree with Your Honor, that Judge Greenlee was in the best spot to judge this man's credibility, and he didn't just decide what took place at the hearing on the post-trial motion. Judge Greenlee said, I heard the guy at trial, I listened to him. He saw the meter, and I believe him. And I think that's what took place in this case, is that Mr. Steers simply forgot about the prior litigation. And we sit here, and we're all, you're the panel of judges and justices, but we're all attorneys, and we all think, geez, you go through something like this, how can you forget it? And I think how we have to look at this is how lay people would look at it. And Mr. Steers simply put this matter behind him, and he forgot about it. Counsel made a comment, or described his prior litigation, that he had an employee that had an accident with a farm implement. That's not actually what happened. My understanding is, from looking through the record, or what's part of the record from what Mr. Steers testified to, is that Mr. Steers has this farm operation, and he has a tractor. And he had a tenant that was renting a farmhouse from him, and her son would help Mr. Steers mow the lawn and stuff, and use a farm tractor to do that. And the young boy was about 15 years old, he took the farm tractor without permission, and had an accident, and two people died. And Mr. Steers was sued under a theory of agency, under a theory of negligent entrustment, and that's, it wasn't an employee of his in the declaratory. What kind of an accident was it? He was apparently going down the road to the home of a friend or something like that, and had a collision with a car. Pardon? I'm sorry, I don't know if it was an intersection or what happened, but he was operating the tractor and had an accident, two people died. And Mr. Steers' involvement was as the owner of the tractor, and again, they tried to look, it was alleged that there was some responding on superior theory or liability there. And State Farm did attempt to deny coverage for it, and State Farm ultimately, I don't know if that went to a trial, or if there was a summary judgment, but ultimately State Farm did not pursue it or something, and State Farm settled the case without Mr. Steers' involvement or personal contribution. And again, as an attorney, I certainly would remember that. However, I have children who tell me all the time they can't believe the stuff that I forget. And I think we have to look at this in the eyes of a layperson, that Mr. Steers just simply went on with his life and forgot it, and forgot about it. Also, however, when he filled out the questionnaire, and this is also in the record, Mr. Steers was asked a question, have you or any member of your immediate family or close friend ever sustained serious injury or disfigurement in an accident? And Mr. Steers put no. And no one caught this, and I'm not bragging or something, but at the hearing end of the post-trial motion, I noticed Mr. Steers has a deformed right hand. And I asked him, and he's right-handed too. So when he filled out this questionnaire, he's using a deformed right hand that he injured in a fireman accident. And I asked him at the hearing, I said, well, why didn't you put that down? He goes, well, I didn't think it was a big deal. I didn't think it was serious. So again, as a layperson, I think Mr. Steers just has a different perspective. And I think he just simply injured his hand in a fireman accident, moved on, said, well, it's no big deal. It's not serious. I can live my life. And so he didn't put that down. The same with the lawsuit. It wasn't a big deal in his life, or if it was, he put it behind him and he forgot about it. So this is an educated man. Yes. Master's degree in music, I believe. Has a business in addition to his farm. Correct. And he doesn't remember two people were killed, and he was responsible in some fashion? I don't know. I disagree with that. And I disagree that Mr. Steers believes that he was responsible. And I believe Mr. Steers did not think he was responsible, and he believed that he shouldn't have been sued. What was the story again? Some kid used an implement that belonged to him? Correct. Well, it was the son of a tenant that rented a farmhouse from Mr. Steers. My understanding is he had a couple different farmhouses on this 750 acres. He had a tenant whose son would visit her during the summer months, summer visitation. For some reason or another, she apparently didn't have custody of the boy. And during the summer months, he would mow the lawn for cash. And it was a summer night or something like that, and this young kid, I'm sorry, this kid took the tractor without permission, drove down the road, and had an accident. Mr. Steers got sued for it. And I believe, you know, the impression I got from Mr. Steers is he didn't think he should have been sued. Now, again, to me, that may make it even more memorable, that not only did he get sued, but he should have been sued. But he was ultimately, in some fashion, found responsible. His insurance company paid up. But it's not clear that the insurance company paid out for Mr. Steers. The issue was whether or not the young boy had permission to use the tractor, and whether or not the young boy was an insured person. If he had stolen the tractor, the young boy is not covered. So I don't know that the $500,000 policy, I don't know that the $500,000 was paid out because it was found Mr. Steers was responsible. The $500,000 may have been paid out because it was found or decided by State Farm that the young boy was an insured under the policy, and they were paying out on behalf of the young boy. But I will say Mr. Steers certainly did not think he was responsible. Justice Myerscough asked Mr. Jones about the time frame of all this. What was that? This lawsuit, this trial occurred in 2009? Correct. And what about the civil suit and litigation that you were talking about earlier? It was all resolved in about 2004, 2005. Now when State Farm decided to pay, and how much time elapsed between then and when those cases were settled, I don't know. But it was at least a passage of four or five years. Does the record show when Mr. Steers' last involvement in that case was? The answer to the interrogatory is, and I believe there's a cover sheet for a deposition, it was a couple of years before that. I don't have the record. 2003? Around there, 2002, 2003. And there's nothing to indicate that Mr. Steers was in any way involved in the settlement. Again, it was handled within the limits of the insurance policy. There's nothing to indicate he was being demanded up to the end to come up with any personal, you know, to contribute personally. So it appears that at least five, maybe six, seven years had passed between his last involvement and when this case went to trial. Also, though, I assume in 2005 he got a letter from his attorney telling him, you know, this case is over, the attorney hired by State Farm to represent him. But I don't know that. Do we know what kind of income Mr. Steers had? In the record, because one of the issues counsel made at the hearing in the post-trial motion was that, you know, he had paid $20,000 and how could you spend $20,000 and forget about it? And I believe he made reference to the fact that from his trucking operations, he has about $200,000 a year in revenue. Revenue? Revenue. And that's not his income, but there's also the farming, and I don't want to say Mr. Steers is well-to-do, but I assume... He owns 750 acres? I don't know if he owns it or he farms it. I think he owns it. I think he would say, if I recall correctly, he owns it. So, you know, and I don't want to... He owns it and he has that in farmers? No, I think he farms it. And then he does this part-time, this trucking he does over the road, some of it is for himself and some of it he does for hire. And, you know, I don't want to be rude to farmers, but I imagine a farmer spending $20,000 isn't going to easily forget about it. I'm not saying that I would expect Mr. Steers to forget about this. I agree with Mr. Jones that this seems somewhat... defies my beliefs that if it was me and I paid $20,000 out of my pocket... You'd remember. I'd remember. The only thing I can say is, you know, from my involvement with Mr. Steers, talking to him over the telephone, and what took place at the hearing on the post-trial motion, I found them to be credible, and I think Judge Greenleaf was in the spot to make that call. Give me the exact question that was asked. I mean, is there some way this man misinterpreted the question? No. And at the hearing on the post-trial motion, he didn't contend that he misunderstood. He just said, I forgot. He said, I forgot. I mean, the question in the questionnaire is, ever, it doesn't say have you, but it is ever a party or witness in a civil lawsuit. It actually starts, In a criminal case, if you or any member of your immediate family or close friend ever been the accused, no. A complainant, no. A witness or a witness, no. Ever been a victim to a crime, no. Ever a party or witness in a civil lawsuit, no. And at the hearing on the post-trial motion, he did not try and hide and say that I was confused, I didn't understand the question. He said, I forgot about it. And also, my recollection is a little different than Mr. Jones's, where the jurors were asked, are the contents of your questionnaire, is everything in there accurate? My recollection is Judge Greenleaf asked everybody. I mean, as a whole. I don't believe Judge Greenleaf went person by person, but I believe he asked as a whole the 12 jurors, or the 12 individuals that were in the box. He asked them, have any of you been a party to a lawsuit? And I believe the way it was phrased is, if your answer is yes to any of my questions, raise your hand. And Mr. Steers did not raise his hand. Was that spelled out three weeks in advance of trial? October, about two and a half, about two and a half weeks. Had Steers ever before served as a juror? Do we know? Yes. And the question is, have you ever served on a jury? Yes. If so, when? Can't remember. Because it kind of supports my position. So he said yes, but I can't remember when? Right. And what type of case is it? It was a rape case. In reading my brief, I'm sure you can tell that I'm kind of, at the beginning of my argument, I was kind of emotional because I have a problem with what Plaintiff's Counsel is doing in this case. He's attacking someone who served as a juror. In effect, he's attacking the other 11 jurors as well, saying that Mr. Steers lied to get on the jury, and some shenanigans took place. And that's another point. I think even if Mr. Steers did intentionally lie or intentionally withhold this information, I still think there has to be some indication that something went wrong. And I'm not going to say there can't be a presumption of prejudice, but there has to be something. In my brief, I point out that there's nothing to indicate anything wrong took place. The jury deliberated for 48 minutes. There wasn't anything about this was a contentious jury or somebody was complaining about Mr. Steers' conduct. But there has to be something. It has to be more than just, well, this gentleman, you know, he withheld information. A lot of people might withhold information because they want to be on a jury and they think they can't be fair. I recently took the deposition of a gentleman who was on a jury of mine, and he was asking during jury selection, do you have any personal injury claims pending at this time? I didn't recognize him. It turned out he had a UIM claim, uninsured motorist claim, that I was defending for the insurance company. Taking his deposition, and he sits there and says, you know, I know you. And I said, from when? He goes, oh, I was on your jury about a month ago. And it was completely innocent. He was just like, I asked him, so why didn't you say it? He goes, well, I didn't think that was something that needed to be mentioned. It wasn't a personal injury claim. It's a UIM claim. So, but I think, you know, even if so, there can be someone that withholds information intentionally and it's done innocently. Mr. Spears, I'm certainly not saying that he did that. But, you know, in my argument, in my brief, is that the plaintiffs have to be able to show that there was some prejudice or at least some indication of prejudice. Well, the problem with that, though, counsel, is you would then be crossing into an area of forbidden inquiry, namely inquiry about jury deliberations and discussions in the jury room. I think the law in Illinois is pretty clear. We're not going to go there. Not only are we not going to go there, but it's not confident testimony and it's inadmissible. If you're talking about extraneous influences of the jury room, fine. But what the jurors said, how they reached their decisions, we're not going to go there. Which means that, assuming that were the standard you were saying, Mr. Jones would not be able to ask and present evidence about how Spears, back in the jury room, said, hey, I've been through this crap before, this is a bad case, we've got to stop all these silly plaintiffs' case. That might have been said. It doesn't matter. And I agree with that. But that's not what I'm saying. So he can't establish it. The prejudice you're claiming he's got to establish, he can't. I disagree that he has to show that. All I'm saying is there has to be something. If this jury had been out for two days, if the judge had had to call them out and give them a 501 instruction, if there was something to indicate that, you know, there's a problem with this jury. This jury was out for 48 minutes. And I submit. So if the jury had been out for two days, you lose? I think that I'm not going to say that I would be conceding the issue, but I think that there would be an argument. But when it comes back. You know, this court, and I think the Illinois Supreme Court has also held repeatedly, that drawing inferences from the length of jury deliberations is a fool's errand. And I can agree with that. And I agree. I've had that happen. I've had a jury out two days. But, I mean, if there was screaming in the jury room, or, you know, the bailiff or the judge had heard it, or they're coming out, they're sending out questions, saying we can't come to an agreement. If there's some indication of something's amiss, well, we didn't have that here. I mean, we had, again, it was a 48-minute deliberations. And I think, if I recall correctly, there was a meal in there. So, you know, they had lunch. I don't think that there was anything back there where there were jurors that were split, and Mr. Steers or anybody had an opportunity. One last question from me on this point. Did you ask, is there any indication of the record as to whether Steers wanted to serve as a jury, as a juror in any case? He'd already served once. The thrill may have been gone. Is there some suggestion that he was looking forward to it or not? Did this come up in the post-trial hearing? No, no. The only thing I remember during jury selection was that they were asked, is there anything in your life that would cause them to do hardship? And, you know, obviously Mr. Steers did not raise his hand. So, at the post-trial hearing, though, when all this came up, no one said, were you trying to get on the jury or were you trying to avoid jury service? Well, he was asked more directly. He was asked, was there anything, you know, were you on the jury? Did you want to get on the jury so you could sabotage this case? Because previously counsels had taken the position that this was Mr. Steers' opportunity in his original. Vengeance. Right, to mete out vengeful justice against Mr. Rapp. And I'm sorry, but I wanted to comment on that, that Mr. Rapp's name was only mentioned during jury selection in terms of his wife was reading the evidence deposition of the treating doctor, Dr. Evans, and her name was mentioned as she was the reader. And apparently she's a former county official in Adams County, and she is married to an attorney, Stephen Rapp. That's what was told to the jurors. And they weren't asked, do you know any of these people or have you ever heard their names? What they were asked is does that, the fact that she's reading this, you know, does her name and her husband's name, does that cause a problem for anybody? And no one raised their hand. What did Steers say in response to the question about the vengeance motive? He said not. You know, he said he had no motive. And he was insistent that he just simply forgot. How old was Steers? I think his question is he was 63, so he's 64 years old. Did Steers ever have any contact with Rapp other than being the name of an attorney involved in that earlier litigation? Mr. Steers, no. And Mr. Steers did not remember, and I believe it's in the affidavit that was filed with the court, that Mr. Steers was unaware of Mr. Rapp's involvement. And, again, Mr. Rapp's name wasn't mentioned throughout our trial other than being the husband. Was Steers asked at the post-trial hearing about whether he recognized Rapp's name? He did not. Correct. I know he was asked. I can't remember if he was asked or if it's in the affidavit. But I do know Mr. Rapp's answer to that, again, whether it was an affidavit or a testimony, was that he did not recognize Mr. Rapp's name, that, you know, he just knew he was being sued by different attorneys. So, like Mr. Jones, you'd be skeptical of this response by Steers, but you heard it, and, like the judge, you believed it. Yeah, as an attorney, yeah, if I went through this, you know, and if I spent $20,000 on attorneys, I would remember it. But, you know, again, I go back to the, you know, Judge Greenleaf went back to the trial and said, you know, from what I heard of this gentleman testifying at the hearing in the post-trial motion when I saw at trial, I believe him. I go back to my telephone call with him on the phone. I asked him, you know, I said, you know, there's a problem. And to me, the gentleman was genuine when he said, oh, you know, I forgot all about that. Okay. Thank you, counsel. Thank you. Mr. Jones? Just a couple other additional points. When you asked the question about the timing of the lawsuits and all that, I believe Steers' answers to interrogatories were filed, at least in one of the cases, March 28th of 03. So, at least at that point, it was still going on. Yeah. And another point that I don't believe has been made to the panel yet is this accident where the two people were killed. Steers said it was about three miles from his house. It wasn't, like, way out in the middle of nowhere where he's, you know, he's unfamiliar with. I mean, when he goes back and forth to his, you know, to his farm and whatnot, I mean, he pretty much has to go by where the accident happened that killed these two people. When counsel was talking about the insurance company paid the policy limits, it was a $500,000 policy limit. It was split between the two states of the, you know, the wrongful death claims. And I don't believe there can be any real argument that Steers wasn't advised that, hey, the insurance company called him up and said, hey, Bob, man, it's all over. We're paying. The case is over. I mean, he knows the case, you know, when it goes away. I mean, and I'm sure he was aware of that. I'm sure he was happy it was going away. I mean, he'd been drug through the ringer on this thing for four or five years. Did you ask him about that? About? When he was called, if he was called, and say the case is over? No. But I can't fathom an insurance company lawyer not calling up the insurer after this case had been going on. These cases had been going on for four or five years, and all the declaratories and whatnot, and saying, you know, Mr. Steers, the case is over. We're going to pay the policy limits. I mean, I think every and any lawyer would say that. The case is over. It's done. You don't have to go to trial. You don't have to do anything more. So I'm sure he was advised of it. And in regard to them, you know, who the insurance company paid on behalf of, well, they had to pay on behalf of his policy. I think it's fair to say, and I think we can all agree to this, I mean, I know when my kid's getting a little fender bender with the car, my insurance premiums go. I'm sure his insurance premiums went up for his farm. Well, they had to pony up the $500,000. They're probably still, you know, elevated rates. Do we know whether Mr. Steers ever had to testify in the declaratory or appear in court? On the declaratory? We don't know that. But we know a complaint was filed and an answer was filed, and it was, you know, going forward.  And then he continued to, you know, retain that lawyer throughout the pendency until the insurance company paid up or settled it. You know, another thing the counsel says is, you know, he accuses me of attacking Steers. I would agree with that. I mean, I don't think what he did here is correct. I just don't, you know, I just can't believe that he forgot about everything. I mean, he goes, you know, the trial courts say you can't talk to anybody. You know, when he went home at night, the wife's like, what are you doing today? Oh, I'm on this jury. What's it about? Oh, this guy's claiming he has damages because he got bit by this poisonous snake. I mean, he's going to talk to his wife, his kids, whatever. But it's not like about what's going on with the case, but something you would think would ring a bell. I mean, since counsel's bringing up Rapp's name, I mean, how Steers can forget his name? Steers is a farmer. And what's one thing farmers watch every night during the growing season? The weather. Okay? The weather. And I know occasionally Mr. Rapp advertises on the local channels down there, and what's the best place to get your ad seen by the most people? Right before the weather. So I submit to you, every night when Steers watches the weather on whatever channel he watches, the local channels down there, because it's pretty much Adams, Pike, and Hancock County, a little bit over into Missouri, right before the weather comes on, because all the farmers and everybody's waiting, here's an ad with Rapp's name on it. Now, if that isn't a reminder that to some degree, just a little bit, that what Rapp put him through for these four or five years, and now it's all gone, I believe, again, is not believable. Well, did Rapp ever have any dealings with Steers personally? Or is it just some name on a document? He sent letters to him when the case was originated, making claims against him. He filed a complaint. I think in many complaints he's on it. And some of those materials are contained in the post-trial motion, but for all what Steers went through for these four or five years, it's not like he got a traffic citation, and he had to go on and plead at a traffic court case. And again, I would submit, that's something that somebody would remember. You get a ticket and you have to go to court? I had to pay 75 bucks. I mean, could you forget that? Perhaps. But I don't think a lot of people do. But this guy's doing this 100% complete memory loss. It didn't happen. And I'll agree with counsel. I'm sure he wanted to forget about it happening. He wants to put it out of his mind. He wishes it didn't happen, as we all do, that these two people weren't killed. But that doesn't mean he can then just say, well, I don't have to disclose this. Or maybe he's embarrassed about it. Maybe that's why when he asked about motive, maybe he's embarrassed about being involved in that. That's why he didn't want to bring it out. I don't know. But it's just something that I find hard to believe, if not impossible, that somebody could forget about. And then one last thing. When you asked about the revenue stream or whatnot, that was asked of him, and he indicated that between his farm and the trucking business, he indicated he's probably making a couple hundred a year. And he said he was the owner and operator of this 750-acre farm. He buys the equipment, whatever. I don't know if he runs the whole thing, but he runs pretty much the farm with the aid of these tenant farmers or whatnot. So he's a highly educated guy. Successful businessman. I'm sure $200,000 in Pike County, owning 750 acres, these are the pillars of the community. It's not Lincoln Park. It would take you pretty far in Pike County. True. Did he actually drive a truck or did he have employees? In regard to the farm, I don't know. But besides owning and operating the farm, he also had a job where he drove, I believe, a semi-truck. Because that's when Council City called him. You know, I called him, too, and when he talked to me, I mean, you know, it's the Hatfields and the McCoys. When I indicated who I was, he was anything but polite or, you know, what can I do for you? It was more like, what are you doing to me? Why are you doing this to me? As opposed to his position. Thank you, Counsel. I think this has been a good one.